UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

UNITED STEEL, PAPER and FORESTRY,    )
RUBBER, MANUFACTURING, ALLIED    )
INDUSTRIAL and SERVICE WORKERS    )
INTERNATIONAL UNION,    )
                                   )
     Plaintiff,    )
                                   )
   vs.    )
                                   )
                                 )    Case No. 1:24-CV-89-ACL
MAGNITUDE 7 METALS, LLC,    )
                                 )
     Defendant.    )

## MEMORANDUM AND ORDER

Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union ("Union") filed this action against Magnitude 7 Metals, LLC ("Magnitude 7") on behalf of its members, seeking damages under the Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101, et seq.  If the WARN Act was violated, each aggrieved employee would be entitled to up to sixty days of backpay and benefits, and the Union may also recover attorney's fees and damages.

Early on the morning of January 24, 2024, Magnitude 7 remorsefully announced that the company would be curtailing operations over the next three two five days.  It indicated that most employees would no longer be needed after January 28.  The notice explained that operations had "been severely impaired to the point where they cannot be restored" by "abnormally cold weather." It also stated that the company had and would continue to "actively hunt for fresh capital from potential investors to support the long-term health of Mag7," adding, "[w]e will continue that journey and look for ways to restart the smelter in the future."

1

Determining whether the WARN Act was violated requires layers of analysis.  The WARN Act requires certain types of companies to provide a 60-day notice of the company's plan to close so that the employees have time to plan for the job loss and transition to other employment.  There are situations where companies are not required to provide a 60-day notice, including closings caused by a natural disaster.  For a natural disaster to relieve a company from providing a 60-day notice, the plant closing must be a *direct* result of the natural disaster.

Presently before the Court are the cross motions for summary judgment filed by the parties.  (Docs. 19, 25.)  These motions are fully briefed and ripe for disposition.

## I.    Background

In its Complaint, the Union alleges that Magnitude 7 violated the WARN Act by failing to provide at least 60-days' notice to its employees prior to laying off those employees at its Marston, Missouri aluminum smelter in January 2024.  (Doc. 1.)  The Union contends that Magnitude 7's failure to provide timely notice resulted in damages to the Union and its members, in addition to entitling the Union to payment of penalties, attorneys fees, and the recovery of damages as provided under the WARN Act.

On March 12, 2025, Defendant Magnitude 7 filed a Motion for Summary Judgment, in which Defendant argues that the WARN Act provides an exception to the notice requirement in cases where a plant closing or layoff is due to "any form of natural disaster."  (Doc. 20.)  Defendant contends that the "extreme weather event" Magnitude 7 experienced in January 2024 qualifies as a natural disaster.  Defendant further argues that the plant was excused from providing the requisite notice because it was unable to timely obtain essential raw materials, which was an unforeseeable business circumstance.  As a result, Defendant contends Plaintiff's claims fail as a matter of law and the Complaint should be dismissed.

2

On March 13, 2025, Plaintiff filed a Motion for Summary Judgment arguing that the Union is entitled to judgment as a matter of law because there is no genuine issue of material fact that the Union has satisfied all the elements under the WARN Act and none of the statutory exceptions apply.

## II.    Summary Judgment Standard

"Summary judgment is proper where the evidence, when viewed in a light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.* "The basic inquiry is whether...it is so one-sided that one party must prevail as a matter of law." *Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005). The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). Once the moving party has met its burden, "[t]he nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial." *Id.*

"The filing of cross-motions does not concede the absence of a triable issue of fact. The court is bound in such cases to deny both motions if it finds ... there is actually a genuine issue of material fact." *Jacobson v. Md. Cas. Co.*, 336 F.2d 72, 75 (8th Cir. 1964).

III.    **Undisputed Facts**

Consistent with the summary judgment standard in mind, and upon reviewing the record, the Court accepts the following facts as true for purposes of resolving the parties' cross-motions for summary judgment:

In 2018, Magnitude 7 began operating an aluminum smelter plant along the Mississippi River in Marston, Missouri.  Magnitude 7 is majority owned by Matt Lucke.  Production and maintenance employees at the plant were represented by the Union for the purpose of collective bargaining.  Prior to its curtailment of operations in January 2024, Magnitude 7 employed more than 100 employees at the Marston facility who in the aggregate worked more than 4,000 hours per week.

In 2023, Magnitude 7 saw declining sales as each quarter provided less revenue from sales than the previous one.  From the first quarter to the fourth quarter, sales had fallen by nearly 34 percent.  Magnitude 7 was profitable in only the first and third quarters of 2023 and saw gross profit losses in the second and fourth quarters.

*The Smelting Process*

At the beginning of January 2024, the plant operated more than 200 reduction cells (referred to as "pots" or "smelting pots") to create aluminum.  The plant required raw materials, including petroleum coke and alumina ore to operate.  Petroleum coke and alumina ore arrived at Magnitude 7 exclusively by barge on the Mississippi River.  Upon arrival, the materials were unloaded at the plant's dock and placed into holding tanks.

Alumina ore, in the form of a fine white dust, was first sent from the tanks to the plant's "Pot Air Control," where it was used for approximately one day to absorb pollutants from the emissions generated by the plant's operations (referred to as the "scrubbing process").  Use of

4

the ore in the scrubbing process caused fluorides to be added to the ore, which was necessary for the ore to be effectively and efficiently heated and made into aluminum during the smelting process.  Alumina is referred to as "clean" ore before it is used in the scrubbing process and "reacted" ore after it has absorbed fluorides in the scrubbing process.  Reacted ore was sent from the scrubbing process to the plant's "pot rooms" where it was placed into the smelting pots to be melted into aluminum.  Petroleum coke, a carbon-rich material resembling gravel, was sent from the holding tanks to an area of the plant called the "green mill" where it was mixed with other materials and cast into large blocks called "anodes."   The new anodes were then baked in a large in-floor oven, after which they were coated with aluminum and attached to rods to be installed into the smelting pots.

The entire process to create and prepare an anode for use in the pots took at least 20 days. Each smelting pot used 18 anodes.  A pot could operate while missing a couple of anodes but could not operate safely if it was missing approximately five or more anodes.  Once installed in the pots, high-voltage electricity was run through the anodes to melt the alumina ore and other ingredients into aluminum.  The aluminum was then extracted from the pots and cast into ingots for sale and distribution.

During the normal smelting process at Magnitude 7, the anodes deteriorated and disintegrated within the pots over time and therefore needed to be replaced approximately every 26 days.  Timely replacement of the anodes before they became too degraded was necessary because use of badly deteriorated anodes in the pots could cause an unsafe condition known as an "open circuit," placing employees at risk of severe electrical shock.  An open electrical circuit caused by use of badly deteriorated anodes in the pots could also cause an explosion.  The pots contain doors over each anode, although those doors are not designed to contain or prevent injury

from an explosion.  The pots also cannot be safely operated without a constant supply of alumina ore.  If there is a lack of alumina ore, the inside of the pots can experience extreme heating and damage to both the pot and surrounding area, open circuit, and explosion.

The plant was designed for continuous operation, requiring a constant flow of new anodes and alumina ore to be used in the pots.  If the pots were shut off for more than a couple of hours due to lack of anodes or ore, the molten material inside the pots would freeze and harden, causing substantial damage to the pots and their components and rendering them unusable.

*The January 2024 Weather Event*

In the week leading up to January 24, 2024, there was freezing on the Mississippi River.  Portions of the river were temporarily closed and several boats were stuck in the ice.  As a result, barges containing the alumina ore and petroleum coke required to operate Magnitude 7's plant were delayed in reaching the plant.  Magnitude 7 asserts that it had never before experienced its barges of alumina ore and petroleum coke being stuck on the river due to freezing conditions or otherwise had its barges delayed for as long as they were in January 2024.[1]

Magnitude 7 sent multiple emails to its supplier regarding the status and expected arrival time of the delayed barges during the week leading up to January 24, 2024.  On January 16, 2024, Magnitude informed its supplier that the "timeline is getting very tight."  On January 17,

---

[1] Plaintiff objects to this statement on the basis that Magnitude 7 has not produced any evidence other than the "conclusory" statements in Greg Lester's declaration executed after the close of discovery to support it.  (Doc. 33 at 2; "Declaration and Affidavit of Greg Lester," Doc. 20-2.) The Court overrules Plaintiff's objection, as Plaintiff has not "come forward with specific facts showing that there is a genuine issue for trial."  *Torgerson*, 643 F.3d at 1042.  This fact is therefore accepted as true.

2024, Magnitude 7 was notified that one of the barges carrying the needed alumina ore would arrive at the plant on January 19, 2024.

On January 21, 2024, Magnitude 7 only had a partial barge of ore at the plant that it was quickly consuming.  It was still awaiting and in need of the full barges, including the barge Magnitude 7 was told would arrive on January 19th.  Throughout the day on January 21st, Magnitude 7 sent emails to the shipping company responsible for the nearest full barge of ore to express frustration and concern over the barge not arriving as scheduled on January 19th.  In these emails, Magnitude 7 again expressed the urgency of the plant's need for ore, stating that if the barge did not arrive soon, it would be "devastating," and "if we run out of ore, it can shut down our plant[.]"  Magnitude 7 also inquired of the shipping company "what can be done to get it moving?" and "[i]s there any way to get it here quicker?"  The shipping company acknowledged the urgency of the situation and explained that the delays were due to weather conditions on the Mississippi River.

On January 22, 2024, Magnitude 7 continued its urgent emails to the shipping company, explaining that "[e]very hour matters right now[,]" "the barges didn't move last night[,]" and "[w]e need your immediate attention."  The shipping company responded that it would continue looking into the matter to find out if any other barges could get to the plant sooner, but explained that it was not likely.  Magnitude 7 requested to join the shipping company's call with the tugboat operator but was informed by the shipping company that the tugboat "know[s] the importance of these barges getting there, and will do everything they can to keep moving."  The shipping company also noted the "risk involved due to the weather" and "ice flowing" down the river and sent a photograph of the ice conditions in an area located north of the plant.  Magnitude 7 was informed by the shipping company that the river was temporarily closed in places "due to

ice conditions" and there was "no time frame when the ice gorge may clear."  It noted that its St. Louis fleet of barges was completely shut down due to the weather conditions.

Simultaneously with Magnitude 7's email exchanges with the supplier and shipping company, Magnitude 7 explored the possibility of swapping barges of ore with another aluminum smelting company that may have a barge closer to Marston.  There was no such barge of ore available that could have arrived at Magnitude 7 more quickly.

Due to the plant's lack of new anodes, Magnitude 7 was forced to leave older anodes in the pots longer than 26 days, resulting in the use of badly degraded and deteriorated anodes. Magnitude 7 was also forced to place what little "clean" ore it had left from the partial barge at its dock into the pots without first using the ore in the scrubbing process to add the fluorides necessary to make it into "reacted" ore.  Placing the "clean" ore directly into the pots staved off an immediate explosion, but it was not a sustainable solution, and the plant could not continue to operate without "reacted" ore.  Between *January 9 and January 19, 2024*, the plant lost **7** pots. (Doc. 20-3.)  It lost another **8** pots between *January 19 and January 23, 2024*, and **16** more pots between the *23rd and January 24*.  *Id*.  A total of **42** pots out of the plant's 232 smelting pots were lost between *January 9 and January 25*, 2024.  *Id*.

At 5:53 a.m., on January 23, 2024, two barges carrying alumina ore arrived at the New Madrid harbor near the Marston facility.

Additionally, in the week leading up to January 24, 2024, various equipment at the plant experienced operation issues due to the freezing temperatures.  For example, on January 20, 2024, plant personnel noted that "a phase I green rollover" was not working and had been "trying to thaw out all morning."  (Doc. 20-9 at 1.)  On January 22, 2024, a water supply line to "a kneader" froze in the "green mill," where anodes are made.  *Id*. at 2.  During the days leading up

8

to January 24, 2024, additional water lines at the plant used in the anode-making process, compressed air lines, and conveyors used to move anodes around the plant froze because of the severe weather.  During that same time, a rotating table used to press the anodes and push them onto the conveyor froze because of the severe weather.[2]

*Curtailment and Notice*

On the evening of January 23, 2024, Magnitude 7 majority owner Matt Lucke made the decision to curtail operations at the Marston facility.  That evening, Magnitude 7's ownership provided the Plant Manager with a notice regarding curtailment of operations ("Curtailment Notice") to be conveyed to employees in the morning, stating the following:

> To all Mag7 employees:
>
> It is with great remorse that we must notify you that we are curtailing operations over the course of the next 3 to 5 days.  Due to abnormally cold weather our operations have been severely impaired to the point where they cannot be restored while running.  These business circumstances were not reasonably foreseeable and outside of our control.
>
> As you may know from the various groups that have toured the plant, we have actively hunted for fresh capital from potential investors to support the long term health of Mag7.  We will continue that journey and look for ways to restart the smelter in the future.
>
> Most employees will no longer be required after January 28th.  Let's work on completing an orderly curtailment and thank you for all of your hard work.

(Doc. 20-13 at 1.)

---

[2] Plaintiff objects to the last two sentences of this paragraph on the basis that they are supported only by the "conclusory" statements in the Declaration of Greg Lester, which was executed after the close of discovery.  (Doc. 33 at 5-7; "Declaration and Affidavit of Greg Lester," Doc. 20-2.) The Court overrules Plaintiff's objection, as Plaintiff has not "come forward with specific facts showing that there is a genuine issue for trial." *Torgerson*, 643 F.3d at 1042.  These facts are therefore deemed admitted.

The next morning, on January 24, 2024, Plant Manager Greg Lester held a meeting at 6:00 a.m. to notify the plant's senior managers and the Union of the curtailment, and to provide a copy of the Curtailment Notice to be read to all employees after the meeting.  Mr. Lester directed Magnitude 7's HR Director to provide additional notice of the curtailment to the Union's Regional Representative, Cameron Redd; however, within minutes of the meeting ending, Mr. Redd contacted the HR Director stating that he had already heard about the curtailment from a Union representative that was present at the meeting.  Mr. Redd asked if Magnitude 7 intended to shut down the facility, if the planned shutdown was temporary or permanent, and if Magnitude 7 had an anticipated timeline for the shutdown.  In response, Magnitude 7's HR Director verbally conveyed notice of the curtailment in a telephone conversation with Mr. Redd and sent Mr. Redd an email containing a copy of the Curtailment Notice.  The Union received the Curtailment Notice on January 24, 2024.  After the Magnitude 7 manager meeting, managers read the Curtailment Notice to all employees working at that time.

On or around January 28, 2024, Magnitude 7 laid off more than 400 employees at the Marston, Missouri facility.  None of the laid-off employees have since been recalled to the Marston facility.

## IV.    The WARN Act

### A.  Plaintiff's Prima Facie Case

"In the wake of numerous plant closings and mergers in the 1970s and 1980s, Congress passed the WARN Act."  *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 482 (3d Cir. 2001).  The purpose of the WARN Act was to provide:

> protection to workers, their families and communities by requiring employers to provide notification 60 calendar days in advance of plant closings and mass layoffs. Advance notice provides workers and their families some transition time to adjust to the prospective loss of

employment, to seek and obtain alternative jobs and, if necessary, to enter skill training or retraining that will allow these workers to successfully compete in the job market.

20 C.F.R. § 639.1(a). Accordingly, the WARN Act states:

An employer shall not order a plant closing or mass layoff until the end of a 60–day period after the employer serves written notice of such an order ... to each representative of the affected employees as of the time of the notice or, if there is no such representative at that time, to each affected employee ....

29 U.S.C. § 2102(a)(1). The WARN Act defines an "employer" as "any business enterprise that employs ... 100 or more employees, excluding part-time employees; or 100 or more employees who in the aggregate work at least 4,000 hours per week (exclusive of hours of overtime)." 29 U.S.C. § 2101(a).

The WARN Act defines a "plant closing" as:

the permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30–day period for 50 or more employees excluding any part-time employees ....

29 U.S.C. § 2101(a)(2).

## B. Exceptions to Liability

"Though the nearly two-month notice period mandated by the [WARN] Act goes far to attain [the WARN Act's] laudable goals, Congress recognized, through the enactment of various exceptions in the statute, that supplying generous advance notice would not be possible, or desirable, in all cases." *Loehrer v. McDonnell Douglas Corp.,* 98 F.3d 1056, 1060 (8th Cir. 1996). There are three exceptions to the federal WARN Act's myriad notice requirements, but only two are relevant here. First, § 2102(b)(2)(A) provides that "[a]n employer may order a

plant closing or mass layoff before the conclusion of the 60-day period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2102(b)(2)(A). That provision does not alter the form or type of notice that employers must provide to their employees. Second, under § 2102(b)(2)(B), "if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States," then no notice is required. *Id.* at § 2102(b)(2)(B). Accordingly, where an employer encounters unforeseeable business circumstances or a natural disaster, it can effectuate a closing or layoff without satisfying all the WARN Act's notice requirements.

An employer who fails to provide adequate notice is "liable to each aggrieved employee who suffers an employment loss" for up to sixty days of backpay and benefits. *Id.* at § 2104(a)(1). However, "[it] is not the intent of the regulations" that "inadvertent errors [serve as] the basis for finding a violation of WARN," so long as "[t]he information provided in the notice" is "based on the best information available to the employer at the time the notice is served." 20 C.F.R. § 639.7(a)(4).

## V.    Discussion

As previously noted, the parties have filed cross motions for summary judgment. Defendant argues that Magnitude 7 is entitled to judgment as a matter of law because it satisfied both the natural disaster and unforeseeable business circumstances exceptions of the WARN Act and provided as much notice as was practicable under the circumstances.

Plaintiff contends that Magnitude 7 is precluded from availing itself of any of the statutory exceptions to the 60-day notice requirement and that it failed to provide Plaintiff with adequate notice of its curtailment of operations. Plaintiff argues that Magnitude 7 cannot show

that 1) "'abnormally cold weather' or freezing on the Mississippi River" qualifies as a natural disaster under the statute, or 2) that the curtailment of the plant's operation was a *direct* result of the weather.  (Doc. 32 at 13.)  Plaintiff further claims that the relationship between the cold weather and the curtailment was "more attenuated."  *Id*. at 15.  Plaintiff claims there "was a sufficient supply on hand of both alumina ore and petroleum coke to continue operating."  *Id*. at 17. Adding, "[i]f the curtailment were due to a frozen river rather than a foreseeable decline in revenues, then operations would have resumed when the river thawed."  *Id*. at 19.  Plaintiff argues that Magnitude 7 is precluded from relying on the "natural disaster" and "unforeseeable business circumstances" exceptions.

As an initial matter, the parties agree that the curtailment falls within the WARN Act's general parameters, such that Magnitude 7 was obligated to provide its employees sixty days' notice prior to the curtailment unless an exception applied.  Although the applicable statute results in a cumbersome analysis, the issues presented are narrow.  The issues before the Court are: (1) whether one of the statutory exceptions applies and, (2) whether the notice provided was sufficient.  The undersigned will discuss these issues in turn.

### A.    Natural Disaster Exception

Section 2102(b)(2)(B) of the WARN Act provides an exception to the notice requirements of the Act, "if the plant closing or mass layoff is due to any form of natural disaster, such as a flood, earthquake, or the drought currently ravaging the farmlands of the United States."  29 U.S.C. 2102(b)(2)(B).

Additionally, section 2107(a) of the WARN Act requires the Secretary of Labor to "prescribe such regulations as may be necessary to carry out this chapter."  29 U.S.C. § 2107(a).

13

The Department of Labor ("DOL") has explained the following regarding the natural-disaster exception to the notice requirement:

(1) Floods, earthquakes, droughts, storms, tidal waves or tsunamis and similar effects of nature are natural disasters under this provision.

(2) To qualify for this exception, an employer must be able to demonstrate that its plant closing or mass layoff is a direct result of a natural disaster.

(3) While a disaster may preclude full or any advance notice, such notice as is practicable, containing as much of the information required in [20 C.F.R.] § 639.7 as is available in the circumstances of the disaster still must be given, whether in advance or after the fact of an employment loss caused by a natural disaster.

(4) Where a plant closing or mass layoff occurs as an indirect result of a natural disaster, the exception does not apply but the "unforeseeable business circumstance" exception described in paragraph (b) of this section may be applicable.

20 C.F.R. § 639.9(c)(1)–(4) (the "DOL regulation").  Further, the DOL has clarified that "[t]he employer bears the burden of proof that conditions for the exceptions have been met." *Id.* § 639.9.

Magnitude 7 argues that it is entitled to summary judgment based on the natural disaster exception.  Specifically, Magnitude 7 contends that the "severe weather event and freezing of the Mississippi River near Magnitude 7's plant" was a natural disaster within the meaning of the Act and it directly resulted in the curtailment of operations at the plant.  (Doc. 18-1 at 4.)

Plaintiff argues that Defendant has failed to carry its burden to show that abnormally cold weather or freezing on the Mississippi River fall within the definition of a natural disaster *or* that the curtailment of operations at the Marston facility was a direct result of the cold weather or freezing.

### 1. Definition of "Natural Disaster"

The WARN Act does not define "natural disaster."  Courts have applied traditional canons of statutory construction to find that its meaning can be inferred from the terms that

surround it.  *See Eisenhauer v. Culinary Inst. of Am.*, 84 F.4th 507, 521 (2d Cir. 2023) ("[T]he canon of *noscitur a sociis* instructs that a word is known by the company it keeps.").  The Fifth Circuit applied this doctrine to hold that "the appearance of 'natural disaster' in a list with 'flood, earthquake, or drought' suggests that Congress intended to limit 'natural disaster' to hydrological, geological and meteorological events" and not extend it to epidemics such as COVID-19.  *Easom v. US Well Servs., Inc.*, 37 F.4th 238, 244 (5th Cir. 2022); *see also Carpenters Dist. Council of New Orleans v. Dillard Dep't Stores, Inc.*, 15 F.3d 1275, 1282 (5th Cir. 1994) (suggesting that exceptions to the WARN Act's notice requirements should be "narrowly construed" so as not to infringe the Act's broad remedial purpose).

Plaintiff argues that neither cold temperatures in January in Missouri nor freezing on the Mississippi River rise to the level of a natural disaster within the meaning of the WARN Act. Instead, Plaintiff argues that cold temperatures are "a routine feature of the local climate," and do not result in the kind of widespread damage associated with floods, earthquakes, and droughts. (Doc. 32 at 14.)

Defendant contends that the ice gorge on the Mississippi River, as it was described and documented by the barge operators, "which was so severe that boats became stuck in the ice and portions of the river were completely shut down, is an effect of nature similar in type to a flood, earthquake, drought, storm, or tidal wave."  (Doc. 41 at 12.)  As such, Defendant argues that the extreme weather event at issue falls squarely within the inclusive language of the WARN Act's natural disaster exception.

Plaintiff's description of the weather event at issue as simply "cold temperatures in January" does not accurately portray the circumstances in this case.  The facts regarding the weather in the week leading up to January 24, 2024 and its effects on Magnitude 7's receipt of

raw materials are largely undisputed. Defendant has submitted email exchanges between Magnitude 7 and its supplier which reveal boats were stuck in the ice on portions of the Mississippi River, resulting in the delay of Magnitude 7's receipt of its shipment of raw materials. The shipping company explained the "risk involved due to the weather" and "ice floating" down the river, and sent photographs of the conditions just upriver from the plant. Defendant has attached these photographs to its Motion. (Doc. 20-4 at 3.) Further, the record supports that this was not a routine weather event. There were temporary closures due to ice conditions on portions of the river, five boats were stuck in the ice, and as of Monday morning, January 22, there was "no time frame when the ice gorge may clear." (Doc. 20-4 at 2.)

While the distance between these severe ice conditions and Marston was not clear, the communications from the shipping company repeatedly referenced "the ice situation" as the cause of the slow-moving barges. *Id*. at 1. Plaintiff provides no evidence to refute Defendant's account of the weather event and its effects on barge traffic, including Magnitude 7's suppliers of raw materials. Instead, Plaintiff relies on the general statement that "cold temperatures" do not satisfy the requirements of the natural disaster exception.

The cold temperatures experienced the week leading up to the curtailment resulting in the uncharacteristic freezing of portions of the Mississippi River is undoubtedly a "hydrological event." The Court finds that the dangerous conditions created for barge operators and the shutting down of portions of the river to barge traffic caused by this hydrological event could be characterized as a "natural disaster" under the WARN Act.

## 2. Direct Result

The finding that the weather event at issue fits within the definition of natural disaster

under the statute does not end the inquiry.  Magnitude 7 must also demonstrate that the Marston plant curtailment was a direct result of the weather event.

Plaintiff argues that the curtailment was not a direct result of the weather event such as a natural disaster suddenly and unexpectedly destroying an employer's facility.  Plaintiff notes that Defendant argues in its brief in support of its Motion that "[i]f the river had not frozen in January 2024, Magnitude 7's plant could still be operating."  (Doc. 21 at 18.)  Plaintiff argues that, by this statement, Magnitude 7 concedes that any alleged damage to the Marston facility caused by cold weather was insufficient on its own to cause the curtailment.  Instead, Plaintiff contends that the connection between the cold weather and the curtailment was more attenuated.  Plaintiff further argues that the evidence shows that there is a genuine issue of material fact as to whether the weather event was the actual reason for Magnitude 7's decision to curtail operations.

Defendant responds that direct causation equates to "proximate" causation, which is not synonymous with sole cause.  Defendant argues that Magnitude 7 has provide undisputed evidence showing the impact of the weather on the plant's operations and safety necessitating the curtailment of operations.

Although the Eighth Circuit has not addressed this issue, the Fifth Circuit held that the "direct result" requirement imposed by the DOL regulations equates to proximate causation. *Easom*, 37 F.4th at 245.  The Court explained that proximate cause is "not synonymous with sole cause," and merely serves "'to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.'"  *Id.* (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)).

Plaintiff relies upon *Benson v. Enter. Leasing Co. of Orlando, LLC*, No. 6:20-CV-891-RBD-LRH, 2021 WL 1078410 (M.D. Fla. Feb. 4, 2021), in support of its argument that the

curtailment was an indirect result of the weather event. The *Benson* Court considered whether the COVID-19 pandemic fell under the natural disaster exception to WARN Act liability. The Court held that, although COVID-19 may be a "natural disaster" within the meaning of the WARN Act, the plaintiffs' complaint did not allege that their layoffs from a car rental company at two airports "resulted directly from the pandemic." *Id.* at *5. The Court explained as follows:

> The Complaint (and unfortunate experience) shows a more tenuous connection: COVID-19 caused global concern over the spread of the virus, leading to a global shutdown—travel stalled, as did economies. So fewer people traveled, fewer people flew—and fewer people rented cars from Enterprise in Orlando's and Tampa's airports. Enterprise experienced "a dramatic downturn in business" and Plaintiffs were laid off. *This isn't a situation where, for example, a factory was destroyed overnight by a massive flood—that would be a "direct result" of a natural disaster. This is an indirect result—more akin to a factory that closes after nearby flooding depressed the local economy. Defendants' facilities or staff didn't disappear overnight, suddenly wiped out.* Instead, COVID-19 caused changes in travel patterns and an economic downturn, which affected Defendants—so the natural disaster defense doesn't apply; rather, the "unforeseeable business circumstances exception" is the proper focus.

*Id.* (emphasis added).

The natural disaster exception is rarely used, and the Eighth Circuit has not had occasion to consider the causation necessary between a natural disaster and a layoff. Although *Benson* is not controlling, the undersigned finds the reasoning instructive in this case. The indirect effects of the COVID-19 pandemic on the business of Enterprise is analogous to the effects of the weather event on the curtailment of operations at Magnitude 7.

Here, the Marston factory was not destroyed by the cold weather event the area experienced the week leading up to January 24th. It is true that Magnitude 7 has provided documentation that the cold weather impacted some of the equipment during this week. For example, plant personnel noted on January 20, 2024 that certain equipment was not working and had been "trying to thaw out all morning," and some water lines froze during that week. (Doc.

18

20-9.)  Magnitude 7 has not presented any evidence or argued that the cited effects of the cold weather on equipment were anything other than minor and temporary, or that they had never experienced such issues during previous winters.

Instead, as Plaintiff notes, Defendant argues that if "the river had not frozen in January 2024, Magnitude 7's plant could still be operating." (Doc. 21 at 18.)  Indeed, Defendant's focus in its briefing is on the delayed shipments of raw materials caused by the unprecedented freezing of the Mississippi River near the Marston plant impeding barge traffic, rather than any permanent damage to the plant's equipment.  Defendant's communications with the shipper document the effects of the icy river conditions on its suppliers leading up to January 24th.  The delayed shipments of raw materials caused the Marston facility to run low on raw materials, which in turn affected the Marston facility's ability to operate continuously.  The effects of the weather event on the facility operations were, therefore, more attenuated than contemplated by the statute.

Further, Defendant's argument that the curtailment was directly caused by the weather event is belied by the language of the curtailment notice.  The notice first cites the "abnormally cold weather" as the reason for ceasing operations.  In the next paragraph, however, the notice remarks that Magnitude 7 had "hunted for fresh capital from potential investors," as the employees "may know from the various groups that have toured the plant," and that the company would "continue that journey." (Doc. 20-13 at 1.)  The curtailment notice therefore suggests that the curtailment is caused, at least in part, by a lack of capital that had been known to the company and its employees prior to the weather event.

What's more, the plant was behind on making anodes.  Plant Manager Greg Lester photographed several damaged anodes on January 22, 2024 (Doc. 20-8 at 2-5).  He shared the

pictures with two of the owners the next day to emphasize why they "need anodes on schedule changed out." *Id*. at 1.  Lester commented, "[t]his issue not only provides very pour purity but also lowers butt materials back to the green mix and runs rod repair expense through the roof." *Id*.  David Kaplan thanked Lester for the pictures and then asked, "[h]ow much did the ore delays add to the problem?" *Id*.

The undisputed facts support multiple factors contributed to Magnitude 7's decision to curtail operations.  Under these circumstances, the Court finds that the closing of the Marston plant was an *indirect* result of the weather event at issue.  As such, the natural disaster exception does not apply, but the "unforeseeable business circumstance" exception may apply.  *See* 20 C.F.R. § 639.9(c)(4).

### B.    Unforeseeable Business Circumstance

To repeat, "[a]n employer may order a plant closing or mass layoff before the conclusion of the [notice] period if the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required."  29 U.S.C. § 2102(b)(2)(A).  "The test for determining when business circumstances are not reasonably foreseeable focuses on an employer's business judgment" and requires that the employer "exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market."  20 C.F.R. § 639.9(b)(2).  "The employer is not required, however, to accurately predict general economic conditions that ... may affect demand for its products and services." *Id.*

Under this test an "important indicator" is whether the business circumstances are "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control," such as "an unanticipated and dramatic economic downturn." *Id.* at § 639.9(b)(1).  *See*

*also Loehrer,* 98 F.3d at 1061 (noting that "a company will be excused from WARN liability if, when confronted with potentially devastating occurrences, it reacts as would reasonable employers within its own market"). Thus, a determination of whether a particular business circumstance was foreseeable "involves a highly factual inquiry to be assessed on a case by case basis." *Id.* at 1060 (internal citation omitted).

Defendant argues that Magnitude 7 is entitled to summary judgment based on the unforeseeable business circumstances because the extreme freezing on the Mississippi River and resulting delay in shipment was not reasonably foreseeable. Defendant further argues that Magnitude 7 was not reasonably able to predict that equipment—including equipment needed in the anode-making process—would be rendered inoperable. Without a constant flow of new anodes, the pots were at risk of explosion. Defendant contends that Magnitude 7 exercised sound business judgment in determining that curtailment of operations was necessary.

Plaintiff first argues that Magnitude 7 cannot rely upon the river freezing or shipping delays in invoking this exception because these circumstances were not communicated to employees. Instead, the Curtailment Notice stated only that "abnormally cold weather" had *impaired* operations. Plaintiff next argues that, even if these circumstances are considered, Magnitude 7's argument is belied by the fact that its did not make the decision to curtail its operations until *after the delayed barges arrived*. As such, Plaintiff contends that the Marston facility was no longer at immediate risk of running out of alumina ore, and inventory records show the company had a sufficient supply of petroleum coke on hand to continue operating. Additionally, Plaintiff argues that Magnitude 7's financial statements and the fact that the facility has remained idle for more than a year since the Mississippi River thawed suggests that *the actual reason for the decision to curtail operations was the company's declining revenue*.

Finally, Plaintiff argues that Magnitude 7 has failed to show that cold weather in January was reasonably unforeseeable.

As noted above, Plaintiff first argues that Magnitude 7 cannot rely on the shipping delays caused by the frozen Mississippi River because these facts were not communicated in the Curtailment Notice.  The undersigned finds that this argument is more relevant to the adequacy of the notice than the applicability of the unforeseeable business circumstances exception, and will address it in that context.

 Plaintiff's argument that the timing of the decision to close the Marston facility is fatal to Magnitude 7's claim ignores many of the relevant undisputed facts.  Plaintiff contends that the Marston facility was no longer at risk of running out of alumina ore and had a sufficient supply of petroleum coke to continue operating.  In support, Plaintiff has attached Magnitude 7's inventory records, indicating that the plant had approximately "1.2 days" of alumina ore in tank and approximately "3.1 days" of petroleum coke in tank on January 22, 2024.  (Doc. 27-1 at 18-21.)

Defendant admits that its employee sent an email regarding "tank inventories" on January 22, 2024, containing the figures noted by Plaintiff.  Defendant first notes that the employee also expressed skepticism that the plant had that much ore, explaining that the number "hasn't been moving much so it may fall unexpectedly later.  So don't get too comfortable with that number." *Id.* at 18.  Further, Defendant contends that the number of "days" or "production days" of inventory is meaningless when stated out of context, as having 1.2 days of ore "in the tank" is not the same thing as saying the plant could continue to operate safely for 1.2 days.  Defendant refers to the detailed explanation of the smelting process, which Plaintiff has not disputed.

In brief, Defendant explained that making "clean" alumina ore into the necessary "reacted" ore for use in the smelting process takes time, as does making petroleum coke into anodes. Defendant pointed out that the plant's storage tanks are not instantaneously replenished when a barge arrives; rather, it takes time to dock and unload the barge and to move the ore to the holding tank. Once in the tank, the alumina ore does not immediately fill the smelting pots. Instead, the "clean" ore has to be transferred to the "Potroom Air Control" to be used in the "scrubbing process" for approximately a day to become "reacted" ore. Then, the "reacted" ore is transferred to the plant's "pot rooms" to be placed into the smelting pots. Defendant explains that petroleum coke also undergoes a lengthy process, requiring at least twenty days to be made into usable anodes for the smelting process. Further, timely replacement of the anodes was necessary because use of badly deteriorated anodes in the pots could cause an open circuit or explosion. As a result, Defendant argues that, even with the alumina ore that arrived on January 23rd, Magnitude 7 determined that "it was too late—the complications caused by the severe weather, and in particular the delayed barges caused by the freezing of the Mississippi River had pushed the plant over the tipping point such that it would be impossible to catch up on making reacted ore and anodes quickly enough to continue operating safely." (Doc. 41 at 18.)

Plaintiff's argument that Magnitude 7 had sufficient inventory of petroleum coke in its storage tanks for 1.9 production days, and potentially another 6.6 production days of petroleum coke on a barge ignores Defendant's explanation of the effects of the delayed shipment on the smelting process. Plaintiff does not attempt to dispute any of Defendant's supported facts regarding this process. Thus, Magnitude 7's decision to curtail operations on the evening of January 23rd— after the arrival of the barges of alumina ore—is not necessarily inconsistent with Magnitude 7's explanation that the weather event influenced the decision to curtail operations.

Finally, Plaintiff contends that the actual reason for the decision to curtail operations was Magnitude 7's declining revenue, which is buttressed by the fact that the facility has remained idle long since the Mississippi River thawed.  Defendant responds that Plaintiff's suggestion that "the plant could simply be switched back on when the cold weather passed is entirely baseless and unsupported by the evidence."  (Doc. 41 at 16.)  Defendant argues that Magnitude 7 exercised sound business judgment in determining that curtailment of operations was necessary under the circumstances where it faced the risk of severe electrical shock to employees due to open circuit and the risk of devasting injury from explosion.   That said, the emphasis on the dangerousness of operating the pots without the necessary anodes calls into question how the plant allowed itself to run so low on production of anodes along with the raw materials required for safe operation, especially when the anode creation requires at least twenty days.

The weather event that occurred the week preceding January 24, 2024, resulting in the freezing of the Mississippi River and the delayed receipt of critical raw materials at the Marston plant could be seen as a "sudden, dramatic, and unexpected" event outside Magnitude 7's control.  20 C.F.R. § 639.9(b)(1).  The Court finds there is no genuine dispute that the delayed shipment of raw materials due to the weather event negatively impacted production at Magnitude 7.  Additionally, there is no genuine dispute that Magnitude 7 could not have foreseen that an ice gorge on the Mississippi River would delay the shipment of raw materials 60 days prior to January 24, 2024.  Even so, there is a factual question as to whether the quantity of alumina ore and petroleum coke stored at the plant was an exercise of "commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market," when those materials dramatically impact the plant's ability to continue operating and to ensure the safety of its workers.  Similarly, a factual issue remains as to whether Magnitude 7

24

should have reasonably been able to predict that certain equipment would be negatively impacted by the cold weather.

Further, the unforeseeable business exception only applies, and excuses Magnitude 7 from WARN liability, if Magnitude 7 also complied with all statutory and regulatory requirements related to the exception.  *See* 29 U.S.C. § 2102(b)(3); 20 C.F.R. § 639(b).

## C.    Notice

The Court will now consider whether the Defendant complied with its duty under the unforeseeable business exception to "give as much notice [of the curtailment] as is practicable," including "a brief statement of the basis for reducing the [60–day] notification period."  29 U.S.C. § 2102(b)(3); *see Burnsides v. MJ Optical, Inc.,* 128 F.3d 700, 704 (8th Cir. 1997) (discussing employer's obligation to provide notice when employment loss is caused by unforeseeable business circumstances).  The brief statement must be based on "the best information available to the employer" at the time notice was provided.  *Id.* at § 639.7(a)(4).  It is not the intent of the regulations that "minor, inadvertent errors are to be the basis for finding a violation of WARN."  *Id.*

Pursuant to regulations promulgated under the WARN Act, the requisite notice provided to the representative of affected employees must contain the following pieces of information:

> (1) The name and address of the employment site where the plant closing or mass layoff will occur, and the name and telephone number of a company official to contact for further information;
> (2) A statement as to whether the planned action is expected to be permanent or temporary and, if the entire plant is to be closed, a statement to that effect;
> (3) The expected date of the first separation and the anticipated schedule for making separations; and
> (4) The job titles of positions to be affected and the names of the workers currently holding affected jobs.

20 C.F.R. § 639.7(c)(1)-(4).  The Regulations note that even in the event of a natural disaster which "may preclude full or any advance notice, such notice as is practicable, containing as much of the information required in § 639.7 as is available in the circumstances of the disaster still must be given, whether in advance or after the fact of an employment loss caused by a natural disaster."  20 C.F.R. § 639.9(c)(3).

### *Regulatory Requirements*

Plaintiff argues that the Curtailment Notice provided by Magnitude 7 did not substantially comply with any of the four regulatory requirements.  Defendant contends that Magnitude 7 provided as much notice as was practicable under the circumstances and its notice substantially complied with the WARN Act.

### 1.  Name and Address

The Union first accurately points out that the Curtailment Notice did not include the name and address of the site where the plant closing would occur, *or* the name and telephone number of a company official to contact for further information.

As to the name and address of the facility, Defendant responds that this argument is unavailing because the name of the site is referenced in the notice, which is directed to "all Mag7 employees," and Magnitude 7 had only one site.  Defendant argues that this was at most a "technical deficiency," that did not prejudice Plaintiff in any way.

Next, as to the contact information of a company official, Defendant responds that Plaintiff "already knew who to contact, and how to contact her, as it immediately sent an email to Magnitude 7's HR Director (Kathee Brown) on the morning of January 24, 2024, seeking information regarding the curtailment."  (Doc. 36 at 19.)  Defendant notes that Ms. Brown and the Union's representative (Cameron Redd) had a telephone call and email exchange that

morning regarding the curtailment.  As a result, Defendant contends that Plaintiff was not prejudiced by the lack of contact information provided.

### 2.  Permanent or Temporary

Plaintiff argues that the Curtailment Notice fails to make clear to employees whether Magnitude 7's curtailment of operations is expected to be permanent or temporary.  The notice states that Magnitude 7 will be "curtailing operations over the course of the next 3 to 5 days," explaining that "due to abnormally cold weather our operations have been severely impaired to the point where they cannot be restored while running."  The notice indicated that Magnitude 7 will look for "fresh capital" and "ways to restart the smelter in the future."  Plaintiff argues that reasonable employees reading this notice would be "left to wonder whether the inevitable return of warmer weather would permit Magnitude 7 to resume operations," or if Magnitude 7 "had a realistic opportunity to obtain 'fresh capital.'"  (Doc. 39 at 3.)

Defendant responds that Magnitude 7's notice was based on the "best information available" at the time and it therefore complied with the Regulations.  Magnitude 7 further explained that the statement about "look[ing] for ways to restart in the future" indicates that it did not have ability to restart at the time when the notice was provided but that it was hopeful it might be able to reopen "in the future."  Defendant argues that there is nothing more Magnitude 7 could have said at the time to convey its truthful expectations regarding whether the curtailment would be permanent or temporary.

### 3.  Date and Schedule of Separations

Plaintiff argues that it is undisputed that the Curtailment Notice fails to set forth a schedule for making separations.  The notice states only that "[m]ost employees will no longer be required after January 28th."  Plaintiff argues that the statement does not provide a specific

date of the first separation and it is ambiguous as to whether, how many, and which employees may be required after January 28th.  Plaintiff further argues that the statement implies that some subset of employees will be required after January 28, but is ambiguous as to how long those employees may be retained.

Defendant again argues that Magnitude 7 provided as much information as it had, explaining that the curtailment would be carried out over the next 3-5 days, and that most employees would no longer be required after January 28th.  Defendant contends that the information provided complies with the Regulations.

### 4.  Employee Names and Job Positions

Finally, Plaintiff notes that the notice fails to identify the job titles or names of affected employees or any information regarding the schedule of separations.

Defendant responds that the notice was addressed to "all" Magnitude 7 employees; therefore, all employees were affected.  Defendant argues that Magnitude 7 provided the necessary information to comply with the Regulations.

In sum, Defendant does not dispute that Magnitude 7 did not fully comply with the language of the regulatory requirements.  Defendant nonetheless argues that Magnitude 7 *substantially complied* with the Regulations, as the errors were minor, were based on the information Magnitude 7 had at the time, and did not prejudice Plaintiff.

When assessing compliance with the four elements contained in the Regulations, courts generally focus on whether the employer's notice, even if technically deficient, substantially complies with the WARN Act's overarching purpose of informing employees of an imminent and permanent job loss.  *See Kalwaytis v. Preferred Meal Systems, Inc.*, 78 F.3d 117, 121 (3rd Cir. 1996) ("Fairly read, the regulations require a practical and realistic appraisal of the

information given to affected employees"). In determining whether an employer's notice substantially complies with the purposes of the WARN Act, the employees' actual knowledge may be relevant in determining if they were prejudiced by the deficiency in the notice. *Schmelzer v. Office of Compliance*, 155 F.3d 1364, 1370 (Fed. Cir. 1998).

For example, in *Schmelzer* the plaintiff government employee was terminated when his employer's operations were privatized. 155 F.3d at 1365. The plaintiff alleged his employer provided insufficient notice when he received a letter on January 23, 1996, informing him that his employment would end on February 13, 1996. *Id.* The Federal Circuit concluded that a prior letter received by the plaintiff on December 13, 1995, although it did not comply with any of the four regulatory requirements, substantially complied with the notice requirements because it provided sufficient information for the plaintiff to understand the privatization timeline. *Id.* at 1370. The Court highlighted that the WARN Act Regulations permit "minor, inadvertent errors" so long as they do not defeat the purpose of the notice, which is to provide employees with time to adjust. *Id.* at 1369. In doing so, the court recognized that the purpose of the WARN Act is met when employees have enough information to make informed decisions, even if the notice itself contains minor defects. *Id.* at 1370. *See also Marques v. Telles Ranch, Inc.*, 867 F. Supp. 1438, 1446 (N.D. Cal. 1994) (notice substantially complied with WARN Act even though it did not comply with regulations when it was given at the end of the harvesting season, and employees would not have expected to return to work the following season due to the complete cessation of operations).

Here, the Court agrees with Defendant that some of the deficiencies pointed out by Plaintiff were technical errors that did not prejudice Plaintiff. For example, Defendant has shown that the name and address of the Marston plant was obvious and that Plaintiff's

29

representative clearly knew how to contact a company official for further information based on her actions.

Other deficiencies pointed out by Plaintiff, however, are more than mere technical errors. Specifically, Plaintiff's argument that the Curtailment Notice fails to make clear whether the curtailment is expected to be permanent or temporary is well-taken. The Court agrees with Plaintiff that a reasonable employee reading the Curtailment Notice could be left to wonder if operations would resume as soon as the cold weather passed. The reference to Magnitude 7's search for "fresh capital" provides no additional clarity to an employee attempting to discern when operations would resume. Similarly, the Curtailment Notice failed to identify the job titles or names of affected employees *or* any information regarding the schedule of separations. The notice's reference to "most" employees no longer being required after January 28th suggests that some unidentified employees would either be unaffected by the curtailment of operations or would return to work after a certain period.

Defendant argues that the ambiguous language in the Curtailment Notice regarding whether and when operations would resume should be excused because it was based on the best information available to Magnitude 7 at the time. Whether Magnitude 7 owners had any intention of resuming operations at the time the Curtailment Notice was issued, however, is an issue of fact that cannot be determined from the current record.

Notably, the January 24th Curtailment Notice was the only notice Magnitude 7 issued to employees, even though production never resumed and the employees never returned to work. A subsequent notice better explaining the circumstances, particularly if the reason for the permanent closure differed from the original curtailment, could have cured the noted deficiencies of the initial Curtailment Notice. *See, e.g Kalwaytis*, 78 F.3d at 121 (subsequent clarification

could be taken together with originally erroneous notice to constitute a single, and effective, WARN notice informing employees of a pending termination); *Staley v. FSR Int'l Hotels, Inc.,* 22-CV-6781, 2025 WL 967369, *8 (S.D. NY Mar. 31, 2025) ("The Court concludes that the WARN Act requires employers to provide additional notice when an employer relies upon the unforeseeable business circumstances exception and the reasons underlying the proceeding closure or layoff change"); *see also Graphic Communs. Int'l Union, Local 31–N v. Quebecor Printing Corp.,* 252 F.3d 296, 299 (4th Cir. 2001) ("[t]he WARN Act clearly contemplates that an employee may suffer multiple employment losses, necessitating separate notices." ).

The Court finds that genuine issues of material fact exist with respect to whether the January 24, 2024 Curtailment Notice was based on the best information Magnitude 7 had at that time. As a result, genuine issues of material fact exist as to whether the Curtailment Notice complied with the WARN Act's regulatory requirements. Thus, neither party is entitled to summary judgment on this issue.

### *Statutory Requirement*

Defendant must also provide a "brief statement of the basis for reducing the notification period" which "provide[s] employees with information that would assist them in determining whether the notice period was properly shortened." 29 U.S.C. § 2102(b)(3). An adequate brief statement "should set forth the underlying factual events which led to the shortened period, thereby allowing workers to understand the employer's situation and its reasons for shortening the notice period." *Alarcon v. Keller Indus., Inc.,* 27 F.3d 386, 389 (9th Cir. 1994) (finding notice sufficient that stated the employer could "find no one interested in supplying the necessary working capital to keep the company operational").

31

Notices that simply recite the statutory language are considered insufficient. *Grimmer v. Lord Day & Lord,* 937 F. Supp. 255, 257 (S.D.N.Y.1996) ("By providing that an employer must give a brief statement of the basis for the shortened notice, Congress indicated that it intended something more than a citation to the statute or a conclusory statement summarizing the statutory provision."). Similarly, allusory statements that do not sufficiently define the factual underpinnings of the decision to lay off employees are considered insufficient. *Childress v. Darby Lumber Inc.,* 126 F.Supp.2d 1310, 1318 (D. Mont. 2001) (noting that notice was inadequate as it only stated that the company had "sustained tremendous losses" and that the company was forced to make "some serious decisions").

The Curtailment Notice in this case informed employees that, "[d]ue to abnormally cold weather our operations have been severely impaired to the point where they cannot be restored while running. These business circumstances were not reasonably foreseeable and outside of our control." (Doc. 20-13.)

Defendant argues that this statement was compliant with the statute as it provided the affected employees with a brief statement of the basis for the curtailment of operations within mere hours of determining that continued operations would be impossible.

Plaintiff contends that the Curtailment Notice failed to provide employees with any indication of the underlying facts that made an exception applicable. As previously discussed, Plaintiff notes that the Curtailment Notice made no mention of 1) the freezing of the Mississippi River, 2) shipping delays in the arrival of raw materials, or 3) a lack of alumina ore and/or petroleum coke. Without this information, Plaintiff argues that Plaintiff and affected employees were left unable to understand Magnitude 7's situation and the validity of its reasons for the curtailment of operations.

The Court finds that a reasonable juror could find that the brief statement was inadequate. Due to the varying interpretations that a fact finder could draw from the record and the disputed factual issues outlined above, the Court declines to remove this issue from the jury and will deny summary judgment to Plaintiff and Defendant on this issue.

## VI.    Conclusion

The Court concludes that the undisputed facts support that the natural disaster exception does not apply to excuse Magnitude 7's WARN liability.  The Court further finds that genuine issues of material fact exist with respect to whether Magnitude 7 complied with all statutory and regulatory requirements to avail itself of the unforeseen business circumstances exception to WARN Act liability.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Magnitude 7 Metals' Motion for Summary Judgment (Doc. 19) is **denied.**

**IT IS FURTHER ORDERED** that Plaintiff United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union's Motion for Summary Judgment (Doc. 25) is **granted in part** in that the natural disaster exception to WARN Act liability does not apply, and is **denied in all other respects**.

**IT IS FURTHER ORDERED** that a telephone status conference is set for **Friday, September 5, 2025, at 11:00 a.m.**  Chambers will initiate the call.


  /s/ *Abbie Crites-Leoni*
 ABBIE CRITES-LEONI
 UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of August, 2025.